IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
September 24, 2004 Session

## KAREN RENEE HOWELL v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Greene County**
**No. 01CR039     James E. Beckner, Judge**

_____

**No. E2003-01469-CCA-R3-PC - February 18, 2005**

_____

The Defendant, Karen Renee Howell, pled guilty to three counts of first degree felony murder, one count of attempted first degree murder, two counts of especially aggravated kidnapping, two counts of aggravated kidnapping, and one count of theft over $1,000. After a sentencing hearing, the trial court sentenced the Defendant to three consecutive terms of life without the possibility of parole for the murders, a consecutive term of twenty-five years for the attempted murder, and a concurrent effective term of twenty-five years for the remaining convictions. The Defendant's convictions and sentences were affirmed on direct appeal. See State v. Howell, 34 S.W.3d 484 (Tenn. Crim. App. 2000). The Defendant subsequently filed for post-conviction relief, alleging that her guilty pleas and sentencing were marred by the ineffective assistance of counsel, and that her guilty pleas were not entered voluntarily, intelligently and knowingly. After a hearing, the trial court denied relief. This direct appeal followed. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

DAVID H. WELLES, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and NORMA MCGEE OGLE, JJ., joined.

Gary L. Anderson, Knoxville, Tennessee and Jason E. B. Smith, Franklin, North Carolina, for the appellant, Karen Renee Howell.

Paul G. Summers, Attorney General and Reporter; Mark A. Fulks, Assistant Attorney General; C. Berkeley Bell, District Attorney General; and Eric D. Christianson, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This case arises out of the horrific murders of Vidar, Delfina and Tabitha Lillelid, and the attempted murder of Peter Lillelid in 1997 by the Defendant and five cohorts: Natasha Cornett, Jason Bryant, Edward Mullins, Joseph Risner, and Crystal Sturgill. The Defendant was seventeen

years old at the time of the offenses.  According to the opinion filed in the direct appeal of this matter:

> The defendants were en route from their homes in Pikeville, Kentucky, to New Orleans, Louisiana.  Before leaving Kentucky, they had acquired two guns, a 9mm and a .25 caliber pistol.  Shortly after their departure, they realized that their car, which belonged to Joseph Risner, would not likely sustain the length of the trip.  They discussed the possibility of stealing a car from a parking lot or a dealership before meeting the Lillelids, who were returning to their residence from a religious convention, at a rest stop on Interstate 81 near Greeneville.
>
> Vidar Lillelid, who was an active Jehovah's Witness, approached Cornett and Howell at the rest stop in order to discuss his religious views.  He was accompanied by his son, Peter.  Eventually, Risner and Bryant joined the conversation.  Meanwhile, Mrs. Lillelid and her daughter, Tabitha, were seated at a nearby picnic table.  After a time, Risner, Bryant, Howell, and Cornett joined the entire Lillelid family and continued their conversation.  At some point, Risner displayed one of the guns and said, "I hate to do you this way, but we are going to have to take you with us for your van."  As he then directed the Lillelid family into their van, Vidar Lillelid pleaded with the group, offering his keys and wallet in exchange for permission to remain at the rest stop.  Risner refused.
>
> Vidar Lillelid drove the van while Risner, still armed, sat in the passenger seat.  Risner, Bryant, Howell, and Cornett were in the van with the Lillelids.  Mullins and Sturgill followed in Risner's car.  In an attempt to calm the children, Delfina Lillelid began to sing.  Bryant purportedly ordered her to stop.  Risner directed Mr. Lillelid first to the interstate and then to a secluded road at the next exit.
>
> What happened thereafter is in dispute.  The accounts given by Risner, Cornett, Howell, Mullins, and Sturgill are consistent, except for minor discrepancies.  They claim that Bryant began to take charge of the situation once Risner ordered the van to a stop.  Risner, who was in possession of the 9mm weapon, contends that he handed the gun to Cornett at that point, explaining that he could not continue.  Cornett maintains that she placed the weapon on the floor of the van while Bryant, who had the .25 caliber gun, ordered the Lillelids to stand in front of a ditch.  According to all but Bryant, the Lillelids pleaded for their lives and especially for the lives of their children, promising that they would not call the authorities.  The other defendants contend that when Bryant refused, Cornett and Howell then pleaded with Bryant to let the Lillelids go.  According to the other defendants, Bryant again refused, explaining that the Lillelids would likely call the police.  When Bryant promised that he would not hurt the children, Howell and Cornett testified that they returned to the van, where Risner had remained.  They then heard a rapid succession of gunshots.  Some claim that Mr. Lillelid was the first to be shot, while others say that it was Mrs. Lillelid.  All contend that when the shooting stopped, Bryant returned

-2-

to the van, and said, "They're still f--king alive." He then grabbed the other gun and fired another round of shots. Bryant, they said, laughed and bragged about the shootings. After the shootings, Risner went to his car and removed the license plate and registration from his vehicle. Risner claims that he accidentally struck one or more of the bodies when, in response to an order from Bryant, he turned the van around. They each claim that Sturgill and Mullins remained in Risner's car throughout the entire episode.

At the sentencing hearing, Bryant testified that it was Risner who ordered the Lillelids out of the van and directed them to stand by a ditch. He contended that Risner first shot Vidar Lillelid with the .25 caliber weapon and then slapped Mullins on the shoulder, and that Mullins also shot at the victims. Bryant claimed that he kept his eyes closed during the shootings and that he never fired either weapon. Bryant contended that Mullins and Risner ordered the others into the van after the shootings. The defendants then drove the Lillelids' van to a gas station where they purchased a road map. They stopped at a Waffle House while traveling through Georgia but left the restaurant when a group of police officers arrived. They decided to abandon their plans to travel to New Orleans and instead drove toward Mexico. When they reached the border, they were initially denied admittance because they did not have the proper forms of identification but eventually found a way into the country. While in Mexico, Bryant was shot in the hand and leg. The source of the wound is disputed by the defendants. Bryant testified that Risner asked him to take the blame for the shootings because Bryant was a juvenile. He claimed that when he hesitated, Risner shot him in the hand and in the leg. The other defendants asserted that Bryant's wounds were self-inflicted.

Later, the defendants were stopped by the Mexican authorities. When they claimed they were lost, the officers ordered the defendants out of the van and conducted a search. When they found a knife and a photo album belonging to the Lillelid family, they ordered the defendants to the border to re-enter the United States. American officers searched the defendants at the border patrol and took them to an Arizona jail. At the time of their arrest, several of the defendants [including Howell] had in their possession personal items belonging to the victims.

State v. Howell, 34 S.W.3d 484, 487-89 (Tenn. Crim. App. 2000).

The Defendant was appointed counsel while she was still in Arizona. Upon her return to Tennessee, the State filed formal charges against the Defendant, as well as against her codefendants. The State also filed notice that it was seeking the death penalty as to the four adult defendants; because she was a juvenile at the time of the offenses, the Defendant was not eligible for the death penalty. See Tenn. Code Ann. § 37-1-134(a)(1) (1996). She and Jason Bryant, also a juvenile at the time of the crimes, were subsequently transferred from juvenile court to criminal court to be tried as adults. Shortly before trial, the State notified all defendants that it would not seek the death

penalty against the four adults if each and every defendant agreed to plead guilty to three counts of first degree felony murder and one count of attempted first degree murder, with sentencing left to the trial court's discretion on those crimes.[1] Each of the defendants accepted the plea bargain. The Defendant was subsequently sentenced to three consecutive terms of life in prison without the possibility of parole for the murders and to a consecutive term of twenty-five years for the attempted murder. Her convictions and sentences were affirmed on direct appeal. See Howell, 34 S.W.3d at 484.

In her petition for post-conviction relief, the Defendant alleges two basic grounds for setting aside her convictions. First, she claims that her appointed lawyer ("Counsel") was ineffective in his representation of her. Second, she alleges that her guilty pleas are constitutionally infirm. The Defendant also alleges that the trial court erred in refusing to admit expert testimony concerning Counsel's level of performance.

## PROOF ADDUCED AT POST-CONVICTION HEARING

Dr. Leonard Miller, a clinical psychologist, testified that he is a forensic psychologist specializing in juvenile cases. He was initially contacted by Counsel about the Defendant's case on July 1, 1997. On July 9, 1997, Dr. Miller received a letter from Counsel about evaluating the Defendant prior to her juvenile transfer hearing, which was scheduled for later that month. The letter referenced a one-half hour interview that a Dr. Larkin[2] had conducted with the Defendant. Referring to this interview, Counsel wrote Dr. Miller, "Really, we need to do everything in our power to keep Karen in Juvenile Court. I would bet my last cent that Mr. [sic] Larkin will determine that Karen is not committable."[3] Dr. Miller testified that, in his opinion, a one-half hour interview "would not have been sufficient to assess [the Defendant's] functioning ability, her dynamics, any possible pathology, or any significant factors about her." Dr. Miller told Counsel that he was available to evaluate the Defendant prior to the transfer hearing, and that he was available to testify. However, Dr. Miller heard nothing further from Counsel prior to the transfer hearing.

Dr. Miller next heard from Counsel in October 1997. Counsel again sought Dr. Miller's assistance in evaluating the Defendant, which Dr. Miller agreed to provide. In late October, Dr. Miller returned to Counsel an affidavit setting forth the terms of his involvement. On December 22, 1997, Dr. Miller received a copy of an order from the trial court appointing him to do a psychological evaluation of the Defendant. This order had been signed on November 18, 1997.

---

[1] The plea offer also required the defendants to plead guilty to two counts of especially aggravated kidnapping, two counts of aggravated kidnapping, and one count of theft over $1,000, for which the defendants would each be sentenced to a concurrent effective term of twenty-five years.

[2] Dr. Larkin was a psychologist employed by the State.

[3] Before a juvenile court may transfer a child to criminal court, it must determine that the child "is not committable to an institution for the mentally retarded or mentally ill." Tenn. Code Ann. § 37-1-134(a)(4)(B) (1996).

Because of the late date on which Dr. Miller received the copy of the court order, he did not commence his evaluation of the Defendant until January 6, 1998. The evaluation did not include a determination of whether an insanity defense was supportable, or whether the Defendant was capable of entering a knowing and voluntary guilty plea. According to Dr. Miller, Counsel made no request for a determination of whether the Defendant had a possible "defense" of diminished capacity. Dr. Miller submitted his final report to Counsel on February 11, 1998. Dr. Miller had no further contact with Counsel prior to February 20, 1998, when the Defendant entered her guilty pleas. Dr. Miller had a final visit with the Defendant on March 3, 1998, prior to the sentencing hearing.

After conducting his evaluation, Dr. Miller concluded that there were two bases upon which the Defendant was involuntarily committable to a mental institution: suicidal levels of depression, and a thought disorder. He said that these conditions would also have existed at the time of the transfer hearing. Dr. Miller's report, a copy of which was admitted at the post-conviction hearing, also includes a finding that, at the time Dr. Miller tested her, the Defendant had an I.Q. of 78, indicating that she was "functioning within the borderline retarded range of intelligence." The report further provides that the Defendant was "not suffering from primary mental retardation and in point of fact has the potential to function within the average range of intelligence."

Based on his evaluation, Dr. Miller opined as follows about the Defendant's comprehension of the guilty plea hearing:

> The situation in and of itself was stressful, and would be stressful, I think, for anyone, more so for her because of her psychological state as I have indicated it. So that in and of itself would have diminished her capacity to comprehend the questions that were being asked of her.

He further stated that, unless the Defendant had had a prior "extensive conversation" about what her guilty pleas involved, she would not have been able to understand all of the consequences attendant thereupon. In his opinion, her ability to enter a guilty plea voluntarily, knowingly and understandingly was dependent upon such an extensive pre-hearing conversation that was conducted "in such a fashion that legal materials, complicated materials, were broken down to the level where she could more fully comprehend them . . . ."

Dr. Miller appeared at court on March 10, 1998, thinking that he would be attending and testifying at the Defendant's trial. He did not discover until he arrived at court that the Defendant's sentencing hearing was being conducted. He still expected to testify, but was not called. Dr. Miller stated that he thought his testimony would have been helpful in proving mitigation.

On cross-examination, Dr. Miller acknowledged having told Counsel that it was his "feeling that it was quite difficult to avoid a transfer" from juvenile to criminal court. He further acknowledged having evaluated the Defendant's competency, even though not specifically requested to do so by Counsel. His evaluation indicated that the Defendant was competent.

Dr. Pamela Auble, a specialist in clinical neuropsychology, also testified. She met and interviewed the Defendant in July 2001. Dr. Auble spent a total of nine and three-quarters hours with the Defendant conducting interviews and tests. She also reviewed Dr. Miller's records and evaluation as well as other medical records and the transcript of the Defendant's guilty plea hearing. Dr. Auble compiled a final report based on her analysis, a copy of which was admitted at the post-conviction hearing.

Dr. Auble testified that certain tests she administered to the Defendant indicated that the Defendant was not "exaggerating or faking memory problems," and that she was "giving an honest portrayal of herself." According to Dr. Auble, the Defendant's memory for verbal information is borderline retarded and she has difficulties with concentration. These limitations make it difficult for her "to follow long questions, keep track of what's going on, if the situation is complex." According to Dr. Auble, the acute anxiety and depression that Dr. Miller reported in February 1998 would also disrupt the Defendant's "ability to pay attention and to process what's going on around her." As to the Defendant's capacities during the guilty plea hearing, Dr. Auble opined that the Defendant "would have trouble keeping track of the questions to understand what the content was. You know, in general she had a hard time . . . reasoning and remembering information, so she may have also had difficulty remembering what her attorney had communicated to her as well." Dr. Auble continued:

> It's my opinion that she would have had difficulty processing or understanding emotionally painful information because that's her style to withdraw, to shutdown, to go inside herself.
> In the same way, her ability to pay attention and grasp what she is being told during the plea hearing would have been impaired for the same reasons.

During cross-examination, Dr. Auble made her point more clearly: "[The Defendant's] mental and emotional state at that time [of the plea hearing] was sufficiently impaired that her entering the plea was not in a knowing and voluntary fashion."

With respect to the Defendant's particular susceptibility to the terms of the plea bargain, Dr. Auble testified:

> It's my opinion that she is immature. She is eager to please. She has some trouble being appropriately assertive with people. And it would have intimidated everyone, or anybody, to have the lives of their codefendants depending on what they did. It's my opinion that would have been even harder for [the Defendant] than it would have been for just a run of the mill person because of this personality structure and this personality makeup that she had. Natasha was the closest friend she had ever had; that would have influenced her decision making, as well. Her history of sexual abuse, her history of having a father who had been verbally abusive in her childhood when he was drinking, would have caused her to have a pattern of giving in and acquiescing to authority figures.

-6-

With respect to the Defendant's mental state at the of the crimes, Dr. Auble opined:

> I interviewed her about her recollection of the crimes. And I have reviewed the material that's listed in my report. It is my opinion that because of her -- that she was seriously depressed at the time of the crime, that there was suicidal ideation, that she reported ongoing hallucinations from the time she was 13, and that the context of the crime, and her description of what was going on in her head at the time of the crime, would have supported an inability to aid or abet in carrying out the crime or, as well as, an inability to interfere with what was going on, to stop the behavior of the others.

Dr. Auble reiterated this during cross-examination: "It's my opinion based on my interview with her and what I know about her that at the time of the crime she was knowing, in that she was aware of what was happening, but she was not -- did not have a capacity to participate in it or to stop the proceedings."

The Defendant, Karen Howell, also testified. She stated that her first conversation with her lawyer occurred the night she arrived in Johnson City, Tennessee, after her transfer from Arizona. She also stated that she had never been in court before and had never before been represented by a lawyer. She remembered little about her transfer hearing in July 1997. She maintained that her lawyer told her nothing about an evaluation with a psychologist, and that he never mentioned Dr. Miller to her prior to that hearing. She first met Dr. Miller early in 1998.

After she was bound over to criminal court, her lawyer raised the idea of an insanity defense, but indicated that he did not think it would be successful. He did not discuss with her a diminished capacity defense. Prior to any plea bargain offer by the State, he asked her if she would be willing to testify for the State. She told him "probably not." He did not communicate a plea offer in conjunction with her possible testimony.

Asked about why she pled guilty, the Defendant testified:

> Well, I didn't want the four adults to . . . get the death penalty. And when [Counsel] came to the county jail and approached me and brought to my attention about the plea agreement, I asked him what he thought I should do. And he said that I may have a better chance in front of the judge than a jury, because once the jury sees the pictures, you know, the dead bodies and so on, that I wouldn't have a fair shot at going to trial.

She continued, stating that Counsel told her that she "would have a better chance letting the judge sentence" her, because "[s]ince they didn't try us separately, me and my codefendants, then the jury would probably see us all as a group instead of as individuals, and that when they seen the pictures that they, you know -- wouldn't have a fair chance." She testified that, in making her decision , she "was trusting [Counsel] [because she] . . . had never been through the court system before or to deal

with attorneys so . . . [she] believed him." She explained that, by pleading guilty, she hoped to get "anything but life without parole."

The Defendant testified that Counsel told her that a sentence of life with the possibility of parole meant that she would have to serve 52 years. However, she stated that he also told her that the definition of life sentences sometimes changed, and she "automatically assumed" that she would get the benefit of any lowering of the number of years required to serve a term of "life."

When Counsel spoke with her about the plea bargain offered by the State, she told him that she would have to think about it. On the day that the offer expired, she stated, he returned and told her, "Everybody's already signed and what are you going to do?" He also told her that it was her decision. She said that her family did not want her to plead guilty and wanted her to go to trial. The Defendant testified that Counsel wrote out two benefits that would go along with a guilty plea: that the four adult codefendants would not get the death penalty, and she might have a better chance at a sentence of life with the possibility of parole with the judge rather than the jury. She stated that she "had planned on going to trial until they came up with this plea agreement, and [she] felt a tremendous amount of pressure." She also testified that she gave up her right to a jury trial "[b]ecause [she] believed [Counsel] when he told [her] that [she] would have a better chance on standing in front of the judge than the jury."

Before she signed the Waiver of Rights and Plea of Guilty, Counsel read it to her. She wasn't sure if he explained any of her constitutional rights to her before she signed it. She did not ask him any questions about it. Counsel did not tell her that, by pleading guilty, she would be waiving her right to appeal the result of her transfer hearing. She stated that Counsel did not go over with her any of the questions that the trial judge would be asking her in conjunction with her plea. Nor did he explain to her what was going to happen during the plea hearing. She stated that, during the hearing, she felt "really nervous and . . . kind of trapped." She continued: "I felt I had a responsibility or something, like, if I didn't plead guilty these four adults can die. And I just felt trapped." She explained that she had been friends with the four adults, being closest to Natasha. As to the sentencing hearing, the Defendant stated that she had expected Dr. Miller to testify. She also stated that she did not receive her G.E.D. until 1999.

On cross-examination, the Defendant admitted that, prior to her removal from Arizona, she had been represented by a lawyer as her guardian ad litem in a legal proceeding. She denied that she knew about the State's plea bargain offer prior to Counsel presenting it to her. She also denied that she wanted to take the offer from the beginning.

On redirect, the Defendant stated that Counsel never discussed with her the range of punishment on each of the offenses with which she was charged, nor did he explain the difference between concurrent and consecutive sentences, nor did he explain mitigating and enhancement factors. She reiterated that she did not decide to take the plea offer until the day on which it expired.

Joe Howell, the Defendant's father, testified that, before the Defendant pled guilty, she called him crying and saying that if she did not plead guilty, four of her codefendants would be executed. He told her not to confess to something she did not do, and asked to speak to Counsel. Mr. Howell testified that he asked Counsel, "What are you doing, trying to make her confess to something that she didn't do?" Mr. Howell stated that Counsel told him that the Defendant was no longer his concern and threw the phone down. Mr. Howell was not able to get back in touch with him. Later, however, Counsel told Mr. Howell that it would be in the Defendant's best interest to plead guilty because "the judge would go lenient on her."

Mr. Howell said there were a total of 15 or 20 witnesses on the Defendant's behalf at the sentencing hearing, but Counsel dismissed all of them except Mr. Howell and his son, the Defendant's brother, Bryan Howell. On cross-examination, however, he stated that he did not know if other witnesses might have also testified on the Defendant's behalf.[4]

Bryan Howell, the Defendant's brother, also testified. He spoke with Counsel over the phone a short time before the Defendant pled guilty. Counsel told him that "[t]here would likely to be a better outcome if she would plead guilty, the judge would be more lenient on her than if it was to go to trial and then her to be found guilty." He stated that Counsel tried to explain the possible sentencing outcomes, but that he did not understand what he was being told.

Mr. Bryan Howell stated that the Defendant had told him that she was not going to plead guilty. He learned that she had pled guilty on the news, and became angry. He appeared at the sentencing hearing to testify, and stated that it was "horrible" because he had not been prepared by Counsel about what kinds of questions to anticipate.

Mr. David Leonard testified on behalf of the State. He explained that he began practicing law in the fall of 1994. He was appointed in juvenile court to represent the Defendant while she was still in Arizona. The appointment was renewed in criminal court. He asked for the appointment of another lawyer to assist him, but because his client was not death-penalty eligible, his request was denied. He was, however, able to utilize a jury consultant expert and a private investigator. The criminal court also approved the employment of Dr. Miller.

Counsel testified that he initially spoke with the Defendant over the phone while she was in Arizona. He stated that he never had any problems communicating with her. He testified that he "investigated every possible defense that [the Defendant] could have, whether it be factual or whether it be mental health wise, diminished capacity, insanity, everything [he] could think of." He discussed possible defenses with his client and reviewed the State's evidence with her. He personally spoke with "at least seventy-five witnesses" in the case. His investigator spoke with others. He discussed witnesses' statements with the Defendant. He also communicated with the other defense lawyers working on the case.

---

[4]The transcript from the sentencing hearing reflects that a total of five witnesses were called on the Defendant's behalf, including the Defendant herself. The Defendant's father did not testify at that hearing.

Counsel stated that he initially contacted Dr. Miller prior to July 1, 1997, but that they did not have any substantive conversation until that time. Dr. Miller told him that he was "disillusioned" with the process involving the transfers of juveniles to criminal court. Dr. Miller told him that he could expect the State's psychologist to do a very cursory evaluation. Counsel subsequently received a copy of the State's psychologist's opinion in which the psychologist, Dr. Larkin, opined that the Defendant was not committable. Counsel provided a copy of this opinion to Dr. Miller. According to Counsel, the two men then discussed the report on July 12, 1997, and made a tactical decision to delay Dr. Miller's evaluation of the Defendant, on the basis that they would be unsuccessful in keeping her from being transferred to criminal court. When asked about the delay, Counsel indicated that he was trying to keep the evaluation out of the prosecutor's hands for as long as possible. He testified: "I really didn't want [Dr. Miller] to start until the first of the year, based upon the fact that if his evaluation did raise some sort of legal argument, diminished capacity for example, that I did not want the state to have time before the trial was set to request the Court to grant an independent evaluation."

Counsel testified that he discussed with Dr. Miller the possible defenses of diminished capacity and competence. Counsel testified that Dr. Miller had initially given him an "uncorrected version" of his written evaluation. This report contained, according to Counsel, a lot of the facts of the offenses as related to Dr. Miller by the Defendant. Counsel requested those facts to be stricken from the final report, which he stated Dr. Miller did. The record does not contain a copy of this "uncorrected version." As to his trial strategy, Counsel testified:

> Basically, my whole goal from the beginning of this case was to keep Karen separate and apart from the others. Certainly, in the juvenile transfer hearing, that was our goal, to show, and try to show, that she was a person. . . . [M]y whole goal in the case was to present her as a person, and not some evil person that killed a child.

With respect to mitigation, Counsel testified that he intended to rely upon Dr. Miller's report, the Defendant's family members and friends, and the reduced level at which the Defendant participated in the crimes compared to her codefendants.

Counsel testified that he initially heard about the State's plea bargain offer from one of the other defense attorneys on February 17th or 18th. This other lawyer did not explain the terms to Counsel but told him, "Just go down and talk to your client." Counsel then spoke with the Defendant who, according to Counsel, told him that she had heard that the State had offered a deal whereby, if everyone pled to the felony murder charges, the adult codefendants would be spared the death penalty. The Defendant did not tell Counsel from whom she received this information. She questioned Counsel about why he had not spoken with her sooner about the offer, but told him that she wanted to take it. Counsel testified, "she reacted that whatever it took, she wanted to sign off

on that to save, you know, to get this over with, to save them from the death penalty, basically." Counsel then visited with the district attorney to learn the exact terms of the offer.[5]

Counsel testified that he visited the Defendant "[m]any times" over the next couple of days. The Defendant asked many questions and at one point was referring to a sheet of paper that she had obtained somewhere. Counsel stated that they "talked in great detail" about the plea, the potential ramifications thereof, the potential ramifications of going to trial, and potential appellate issues. He "wanted to make it clear to her that . . . [it] was her decision." He sat down with her with the sentencing guidelines and reviewed those with her in detail. She told him "that she simply wanted a chance one day to get out [of prison], just a chance." He explained to her that the minimum she would get was 51 years, but that "this was not going to be a situation where there would be parole."

Counsel stated that at no time did the Defendant express any reservations about accepting the State's offer. Rather, he told her that she needed to wait, to give him an opportunity to see if he could get a better offer. He visited the district attorney's office repeatedly trying to "get some sort of more favorable result for her." Counsel testified that he tried to get the Defendant to focus on her own situation, not what would happen if she rejected the offer.

Counsel testified that the Defendant did not want him discussing the plea offer with her family, and did not want them present for the submission hearing. Counsel testified that the Defendant told him that she was "ashamed" and did not want "to face her family."

Counsel testified that he did not observe anything that led him to believe that the Defendant's plea was not knowing and voluntary. Nor did he observe anything to indicate that the Defendant did not understand her plea. He discussed with her the actual mechanics of the plea and the questions that the judge would be asking. He read to her and they discussed the negotiated plea and the waiver of rights documents. Counsel testified that, in his mind, the Defendant "understood the ramifications of pleading guilty, the waiver of the rights, the important rights that she would have otherwise maintained." He also stated that the Defendant "seemed sort of relieved that it was finally going to be over." Counsel further testified that he concluded that the State had sufficient evidence to prove its case in chief; and he was aware of no evidence that would have rebutted that case.

Counsel stated that he informed Dr. Miller of the Defendant's guilty plea. He testified that Dr. Miller's response was that it was "probably for the best." They both then traveled to Kentucky in search of witnesses for the sentencing phase. Counsel had made a tactical decision to submit Dr. Miller's evaluation at the sentencing hearing instead of calling Dr. Miller to testify, and Counsel stated that Dr. Miller seemed relieved by this decision.

---

[5]A copy of the letter containing the terms of the State's offer was admitted at the post-conviction hearing. The letter is dated February 18, 1998, and requires acceptance by "the close of business on Friday, Feb. 20, 1998." The plea submission hearing was held on February 20, 1998.

On cross-examination, Counsel admitted that, prior to being appointed to represent the Defendant, he had never handled a juvenile transfer hearing. He had also never represented a client accused of murder. His legal practice at the time he was appointed was "general," including criminal defense, domestic relations, bankruptcy and corporate law. He had handled no more than ten criminal trials at the time he was appointed in this matter. None of his criminal trials involved calling an expert witness to testify.

After being shown a copy of the order, Counsel agreed that the juvenile court ordered July 17, 1997, as the date of the transfer hearing and further ordered that "an evaluation by the state, and an independent evaluation shall be completed on [the Defendant] expeditiously." Questioned as to why he did not have this evaluation done in time for the transfer hearing, Counsel testified:

> There was a time when I became sort of a realist in this case. It's -- You would had to have sort of lived through this case from the beginning. The way I treated [the Defendant] in the transfer hearing scenario was -- I was treating the transfer sort of like discovery, I guess. There was no way, in my opinion, . . . that she would have stayed in juvenile court. The fight was in criminal court.

When asked whether testimony by Dr. Miller at the transfer hearing that the Defendant was committable would have raised a question about the juvenile court's ability to order her transfer to criminal court, Counsel replied, "I have no idea." When asked why he filed a motion for an acceptance hearing after the Defendant had been ordered transferred to criminal court, Counsel stated, "We filed a motion for acceptance hearing as a matter of course, just to file one. . . . We knew what the law was, that in a case like this, there would not be an acceptance hearing granted. And possibly, you know, more so to needle the prosecution a little bit." Counsel subsequently reiterated, "there was no way, in my opinion, that this case was staying in juvenile court. The juvenile court system was not developed to handle cases like this."

Counsel acknowledged that he had subpoenaed Dr. Larkin to appear at the juvenile hearing, but never called him to testify. Dr. Larkin's full report had been filed with the juvenile court, under seal. Neither the State nor Counsel had seen the full report. Counsel admitted that he waived the issue of Dr. Larkin's evaluation in juvenile court.

Counsel insisted that Dr. Miller thought that his strategy of delaying Dr. Miller's evaluation of the Defendant "was a pretty good idea." When confronted with Dr. Miller's contrary testimony, Counsel stated, "He lied."

Counsel acknowledged that, after her sentencing hearing, the Defendant received the most severe sentences for the murders that were possible: three consecutive terms of life imprisonment without the possibility of parole. He admitted that, prior to her agreeing to plead guilty, he told the Defendant that, if she pled, she would have a chance of getting out of prison some day. He maintained, however, that this advice did not influence the Defendant to plead guilty. He admitted that he did not research the average life span of someone serving a term of life imprisonment, and

did not inform his client that the average life expectancy of someone serving life in Tennessee is less than sixty years.

Counsel agreed with the contention that one of the major reasons that the Defendant pled guilty was to save four of her codefendants from having to face the death penalty.

Counsel reiterated that he discussed with the Defendant all of the lesser-included offenses to those that she was charged with. He then admitted that he may not have discussed all of the lesser-included offenses of murder, but did discuss with the Defendant facilitation of first degree murder and second degree murder. When asked whether he thought a jury might have found the Defendant guilty of facilitation of first degree murder rather than first degree murder, Counsel replied that he did not "believe the jury was going to have much sympathy for any of these individuals."

Counsel maintained that, despite Dr. Auble's testimony, the factual proof of the offenses indicated that the Defendant was guilty of more than facilitation to commit first degree murder.

Counsel stated that he advised the Defendant that, upon her plea of guilty, the best sentence she could hope for would still result in her spending fifty-one years in prison.

Counsel acknowledged that, when the Defendant pled guilty, she waived her right to challenge her transfer from juvenile court to criminal court. He stated that he explained that to the Defendant.

Counsel's law partner testified that he graduated from law school in 1994 and went into practice with Counsel. He stated that he had handled three juvenile transfer hearings prior to the Defendant's. Those prior hearings did not involve any psychological issues, however, nor did they involve expert testimony. Co-counsel acknowledged his participation in assisting Counsel at the transfer hearing, but had little recollection of the details. He did not talk with Dr. Miller.

There were no other witnesses at the post-conviction hearing.

## TRIAL COURT'S FINDINGS OF FACT AND CONCLUSIONS OF LAW

After taking the matter under advisement, the trial court entered a twelve-page Memorandum Opinion and Order denying relief. That order contains the following findings of fact and conclusions of law:

> Dr. Miller was asked by [Counsel] to conduct a complete psychological evaluation. Dr. Miller knew all the issues in a transfer hearing and counseled [Counsel] that they probably couldn't win at the transfer hearing, the real battle being in Criminal Court.
>
> Dr. Miller's report was delayed for tactical reasons but a review of all the records and facts clearly shows that the report would have not stopped the transfer in juvenile court.

-13-

. . .

[Counsel] investigated every possible defense and discussed them in detail with the petitioner. They discussed defenses of insanity and diminished capacity.

He and his investigator talked to all possible witnesses, [Counsel] himself interviewed at least seventy five (75) witnesses.

He visited the petitioner frequently, sometimes twice per day. He had talked to her by telephone while she was in Arizona. He took her books to read.

He researched and studied the law pertaining to the case religiously.

Even though their positions were often conflicting, [Counsel] had the advantage of the tremendously talented lawyers representing the co-defendants.

[Counsel] traveled to Kentucky on three (3) occasions in preparation of the case.

The facts were horrible and seemingly impossible to overcome but [Counsel] developed a logical strategy of trying to present the petitioner as a person separate from the others and not some evil person who killed a child.

To this end [Counsel] moved and argued strenuously for a severance at every stage. This court denied a severance and that denial was affirmed on appeal.

[Counsel] filed and had heard volumes of motions. Many pretrial conferences and motion hearings were conducted with the petitioner present. All issues and exhibits were ruled upon and explained before the case was to be tried. Approximately 1,300 exhibits were prefiled and ruled upon and approximately 1,300 motions were filed and ruled upon.

As stated before, [Counsel] urged Dr. Miller to evaluate the petitioner for all possible issues in the case. And Dr. Miller conducted a thorough evaluation and filed an exhaustive report.

Although Dr. Miller concluded that the petitioner was bi-polar with psychotic features and suffering from post-traumatic stress disorder, the details of the report refute those findings and refute any findings of committability at the juvenile level and a defense of diminished capacity at the Criminal Court level. Further Dr. Miller did not find the petitioner incompetent or insane.

. . .

[Counsel] considered and discussed with his client and Dr. Miller all possible defenses including diminished capacity and all other possible mental defenses.

[Counsel] correctly concluded that he did not have a viable mental defense and turned his efforts in the psychological area to mitigation.

. . .

Dr. Auble concludes that the petitioner could not have had the requisite mens rea for the offenses she was convicted of.

Dr. Auble's testimony is not credible. She says she agrees with Dr. Miller's report which contradicts her findings. She did not find the petitioner depressed or suffering from anxiety at the time she saw the petitioner.

-14-

Dr. Auble says the petitioner knew what was happening but did not have the capacity to participate in it. This assertion is contradicted by all of the facts and circumstances of the case.

The petitioner participated in the planning of the "spree" that led to the execution of the Lillelid family, she helped steal the guns and money, she was at the picnic table at the rest area with the Lillelids when they were kidnap[p]ed and saw them crying. She was outside the van watching as the Lillelids were murdered. She did nothing to stop the carnage even when a weapon was available. She deliberately and knowingly participated in every aspect of the killings including the getaway and attempted cover up.

Given the horrific facts and circumstances of the murders and attempted murder, no offer of settlement by the state was anticipated.

[Counsel], however, went several times to the district attorney general to try to work something out that would benefit the petitioner.

. . .

Trial was imminent and [Counsel] was ready for trial.

Then came the offer by the state.

. . .

[Counsel] got word there was a deal on the table but didn't know the details. He went to see the petitioner and she told him all about it. [Counsel] was somewhat upset that the petitioner knew more about the offer than he did.

The petitioner told [Counsel] that whatever it took she wanted to sign off on the agreement.

The petitioner was motivated in part by the desire to remove the death penalty from the adult defendants.

[Counsel] never urged or even advised the petitioner to take the offer and plead guilty. He didn't agree for her to plead guilty until he was certain she fully understood what she was doing and that it was in her best interest.

After the petitioner told [Counsel] she wanted to plead guilty he visited with her many times, more than once a day, to determine if she fully understood. [Counsel] talked with the petitioner in great detail about all aspects of such a plea and the consequences thereof. He insisted she make a decision based on her own situation and not just for the others.

He went to the district attorney general's office several times to try to get a reduction in the offer for the petitioner, after he had told her not to sign the agreement right away.

The petitioner never expressed any reservations about the plea, and there was never anything to cause [Counsel] to believe that she could not voluntarily, intelligently, knowingly and understandingly enter the plea.

Both Dr. Miller and Dr. Auble testified that the petitioner could understand the plea and voluntarily, intelligently and knowingly enter into it if she had extensive conversations with her lawyer about it beforehand.

-15-

[Counsel] and petitioner did in fact have extensive conversations about every aspect and consequence of the plea. All the charges and lesser offenses and possible punishments were explained and understood. The petitioner asked questions about sentencing and mitigation. They talked about what concurrent and consecutive sentences meant. And they went over all the rights and waivers the Court would address during the allocution. [Counsel] explained that all issues prior to the plea would be waived.

Even so, the question has been raised as to why [Counsel] would allow the petitioner to plead guilty instead of going to trial before a jury.

[Counsel] was convinced that any jury would find the petitioner guilty of first degree murder and impose sentences of life without parole. And that the only chance of a lesser sentence was with the trial judge.

Every other attorney in the case had expressed the same opinion, including the attorney for the fourteen (14) year old juvenile, Jason Bryant. His attorney, Robert Jessee, was and is a seasoned, highly respected criminal defense attorney. [Counsel] knew that the other juvenile was going to plead guilty under the same circumstances.

The petitioner was sober at the time and not on drugs.

The evidence was overwhelming and horrible.

There was no logical defense.

. . .

Dr. Miller told [Counsel] he thought the plea was probably for the best.

At the time and place it seemed the best decision for [Counsel] to make.

At the actual taking of the plea the petitioner was sober and articulate and answered all questions appropriately. The transcript of the allocution covers twenty-four (24) pages.

The petitioner and the other defendants signed a "Waiver of Rights and Plea of Guilty." She also signed a document providing the "sentencing will be strictly within the sound discretion of the trial court," which was approved by her attorney. She signed an acceptance of the written plea offer and an acknowledgment of the specific waiver: "Furthermore, having been advised of my constitutional rights, I freely and voluntarily waive my right to a trial by jury, my right not to be compelled to incriminate myself, my right to have a jury impose any fine in excess of $50, and all other rights explained to me. I hereby submit my case to the trial judge for decisions, both as to guilty[sic] and punishment."

Although it was not the usual practice of this court, all defendants agreed to plead guilty at the same time.

This court started by asking questions individually and made certain that all responded in an understanding way to each question asked jointly.

When asked if they had had any alcohol or drugs within the last twenty-four (24) hours, the petitioner answered negatively . . . .

-16-

[The plea] was explained [by the court] in great detail and in simple language what the defendants were pleading guilty to and the sentences that could be imposed and the petitioner said she understood. There is no reason to believe that she did not.
. . .

The petitioner, at all the times she has testified, has demonstrated an ability to understand statements made to her and questions asked of her, and has been able to communicate well. She has obtained her G.E.D. while in the Tennessee Department of Correction.

The petitioner never questioned her plea or asked to withdraw it during the more than two (2) week interval between the plea and the sentencing hearing. No one in the petitioner's behalf ever presented an objection to the trial court concerning the plea.

At the sentencing hearing everything and everyone were presented to the trial court to try to achieve the minimum possible sentence for the petitioner.

[Counsel] says he got the state to agree to let him file Dr. Miller's report instead of having Dr. Miller testify. This seems to have been the best tactic because everything in Dr. Miller's report came in whether legally admissible or not. Further, Dr. Miller himself was not exposed to the real problems he would have had with cross-examination.

Since Dr. Miller was called on behalf of the petitioner at the post conviction evidentiary hearing and Dr. Auble accepted and credited and relied upon Dr. Miller's report, it is not suggested that [Counsel] was ineffective in employing Dr. Miller or that some other psychologist should have been employed.

The petitioner testified at the sentencing hearing as well as several other witnesses including Michael May, April Mullins, Melissa Howell and Bryan Howell. None of these witnesses, some of whom were family members, made any complaint of any kind about the plea the petitioner had entered.

Nothing else is suggested that [Counsel] could have presented in mitigation at the sentencing hearing.

As a result of [Counsel]'s efforts this court found more mitigating factors applicable to the petitioner than the other defendants.

No reasonable person could conclude that the result would have been different if [Counsel] had done everything the petitioner suggests.

The petitioner has not proven her allegations by clear and convincing evidence.
. . .

From all of the above this court finds that the petitioner received effective assistance of counsel and post-conviction relief is denied on that ground and all the sub issues thereof presented to this court.
. . .

From everything in the record and presented at this evidentiary hearing this court concludes that the petitioner's plea of guilty was entered voluntarily, knowingly, understandingly and intelligently in all respects.

We turn now to the Defendant's contentions.

## I.  INEFFECTIVE ASSISTANCE OF COUNSEL

We will first address the Defendant's contention that her lawyer was ineffective in his representation of her.

### A.  Standard of Review

Both the Sixth Amendment to the United States Constitution and Article I, Section 9 of the Tennessee Constitution guarantee a criminal defendant the right to representation by counsel.  See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999); Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). Both the United States Supreme Court and the Tennessee Supreme Court have recognized that the right to such representation includes the right to "reasonably effective" assistance, that is, within the range of competence demanded of attorneys in criminal cases.  See Strickland v. Washington, 466 U.S. 668, 687 (1984); Burns, 6 S.W.3d at 461; Baxter, 523 S.W.2d at 936.

A lawyer's assistance to his or her client is ineffective if the lawyer's conduct "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."  Strickland, 466 U.S. at 686.  This overall standard is comprised of two components: deficient performance by the defendant's lawyer, and actual prejudice to the defense caused by the deficient performance.  See id. at 687; Burns, 6 S.W.3d at 461.  The defendant bears the burden of establishing both of these components by clear and convincing evidence.  See Tenn. Code Ann. § 40-30-210(f); Burns, 6 S.W.3d at 461.  The defendant's failure to prove either deficiency or prejudice is a sufficient basis upon which to deny relief on an ineffective assistance of counsel claim.  See Burns, 6 S.W.3d at 461; Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996).

This two-part standard of measuring ineffective assistance of counsel also applies to claims arising out of a guilty plea.  See Hill v. Lockhart, 474 U.S. 52, 57 (1985).  The prejudice component is modified such that the defendant "must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial."  Id.; see also Hicks v. State, 983 S.W.2d 240, 246 (Tenn. Crim. App. 1998).

In evaluating a lawyer's performance, the reviewing court uses an objective standard of "reasonableness."  See Strickland, 466 U.S. at 688; Burns, 6 S.W.3d at 462; Hellard, 629 SW.2d 4, 8 (Tenn. 1982).  The reviewing court must be highly deferential to counsel's choices "and should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  Burns, 6 S.W.3d at 462; see also Strickland, 466 U.S. at 689.  The court should not use the benefit of hindsight to second-guess trial strategy or to criticize counsel's tactics, see Hellard, 629 S.W.2d at 9, and counsel's alleged errors should be judged in light of all the facts and circumstances as of the time they were made.  See Strickland, 466 U.S. at 690; Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998).

A trial court's determination of an ineffective assistance of counsel claim presents a mixed question of law and fact on appeal.  See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001).  This

Court reviews the trial court's findings of fact with regard to the effectiveness of counsel under a de novo standard, accompanied with a presumption that those findings are correct unless the preponderance of the evidence is otherwise. See id. "However, a trial court's conclusions of law--such as whether counsel's performance was deficient or whether that deficiency was prejudicial--are reviewed under a purely de novo standard, with no presumption of correctness given to the trial court's conclusions." Id.

### B. Analysis

The Defendant first alleges that Counsel was ineffective due to his lack of experience. She points out that Counsel had been practicing law less than three years at the time he was appointed to represent her in juvenile court; had never handled a juvenile transfer hearing; and had never tried a murder case. She argues that, although she was not death penalty eligible because of her age at the time the murders were committed, her case was, in all other respects, the equivalent of a death penalty case, and that she would have been tried jointly in what was a capital case for her adult codefendants. Yet, because of his inexperience, her lawyer was not qualified to represent a capital defendant, even as second chair. For these reasons, she asserts, Counsel was incompetent to handle her case, and did not redress his incompetence through associating a qualified lawyer to serve as co-counsel.

The record does establish that Counsel was relatively inexperienced at the time he was appointed to the Defendant's case. Nevertheless, he had conducted several criminal trials and had some experience in juvenile court. His partner had handled juvenile transfer cases previously, and assisted Counsel in that aspect of the Defendant's case. Counsel's partner also took over representing Counsel's other clients, so that Counsel could devote as much time as possible to the Defendant's case. Counsel did avail himself to some extent of the expertise held by attorneys representing the Defendant's codefendants.

We are reluctant to find that Counsel was incompetent based simply on his level of experience. We are also reluctant to start holding lawyers representing non-capital defendants to the same standards as those representing capital defendants. Nor are we prepared to require an appointed lawyer to associate another lawyer to assist him or her in the handling of any given case. Accordingly, we hold that the Defendant has not demonstrated by clear and convincing evidence that her lawyer's performance was deficient simply because of his relative lack of experience.

The Defendant complains about Counsel's performance with respect to her juvenile transfer hearing. Because the Defendant was seventeen years old at the time of the murders, she was initially under the jurisdiction of our juvenile courts. Our laws provide, however, that

> [a]fter a petition has been filed alleging delinquency based on conduct which is designated a crime . . . under the laws . . . of this state, the [juvenile] court, before hearing the petition on the merits, may transfer the child to the sheriff of the county to be held according to law and to be dealt with as an adult in the criminal court of competent jurisdiction.

-19-

Tenn. Code Ann. § 37-1-134(a) (1996). Before the child may be transferred to criminal court as an adult, a transfer hearing must be held. See id. § 37-1-134(a)(2) (1996). Where the child is at least sixteen years old at the time of the offenses, the juvenile court shall order a transfer where

> The [juvenile] court finds that there are reasonable grounds to believe that:
>
> > (A) The child committed the delinquent act as alleged;
> > (B) The child is not committable to an institution for the mentally retarded or mentally ill; and
> > (C) The interests of the community require that the child be put under legal restraint or discipline.

Id. § 37-1-134(a)(4) (1996). In making the determination of whether to transfer the child to criminal court as an adult, the juvenile court is required to consider, among other matters:

> (1) The extent and nature of the child's prior delinquency records;
> (2) The nature of past treatment efforts and the nature of the child's response thereto;
> (3) Whether the offense was against person or property, with greater weight in favor of transfer given to offenses against the person;
> (4) Whether the offense was committed in an aggressive and premeditated manner; and
> (5) The possible rehabilitation of the child by use of procedures, services and facilities currently available to the court in this state.

Id. § 37-1-134(b) (1996). The Defendant argues that Counsel improperly waived any opportunity she had for avoiding transfer by failing to put on any proof at the transfer hearing that she was "committable."[6]

The Defendant points out that Counsel had originally determined that avoiding transfer was the preferable result. She refers to the letter Counsel wrote to Dr. Miller stating, "Really, we need to do everything in our power to keep [the Defendant] in Juvenile Court." To this end, Counsel obtained an order from the juvenile court authorizing him to obtain a psychological evaluation of the Defendant prior to the transfer hearing. Counsel, however, did not obtain this evaluation and, apparently, did not offer any proof at the transfer hearing about the Defendant's committability.[7]

---

[6]This Court has previously determined that the term "committable" refers to whether the juvenile is involuntarily committable. See State v. Simmons, 108 S.W.3d 881, 886 (Tenn. Crim. App. 2002) (holding that "only a juvenile subject to 'involuntary commitment' may not be transferred . . . .").

[7]At the post-conviction hearing, counsel for the Defendant offered the entire court file of the Defendant's case into evidence, and same was admitted as Exhibit 23. After an exhaustive search by this Court, however, we have failed to find two of the three volumes of the transcript of evidence from the juvenile transfer hearing. We note that it is the appellant's duty to provide this Court with a complete record from which to address the issues raised in an appeal. See

(continued...)

Dr. Miller eventually evaluated the Defendant in January 1998. He testified that, had he evaluated the Defendant prior to the transfer hearing, he would have found two bases for a finding by the juvenile court that the Defendant was involuntarily committable. Those two bases were the Defendant's "suicidality" and a "psychotic element." Dr. Miller explained that, at the time he evaluated her, the Defendant was suffering from "suicidal levels of depression" and "a thought disorder." He opined that both of these conditions existed in July 1997, at the time of the transfer hearing.

When Counsel was cross-examined about why he did not have the Defendant evaluated prior to the transfer hearing such that he could put on proof that she was involuntarily committable, thereby avoiding her transfer to criminal court, Counsel testified that he had "bec[o]me sort of a realist in this case" and had concluded that "[t]here was no way, in [his] opinion, . . . that [the Defendant] would have stayed in juvenile court." He had learned that the State's expert, Dr. Larkin, had evaluated the Defendant and opined that she was not committable. Dr. Miller, he testified, told him that he, Dr. Miller, was "disillusioned" with the transfer process, and agreed with him that they would be unsuccessful in preventing the Defendant's transfer. Accordingly, he abandoned his hope of keeping the Defendant in juvenile court, and treated the transfer hearing as an opportunity for discovery.

We conclude that, in this regard, Counsel's representation of the Defendant was deficient. Counsel abandoned a defense strategy before gathering the facts necessary to make an informed decision about its viability. Although Dr. Miller may have been "disillusioned" generally with the transfer process, he was certainly in no position to advise Counsel about their particular likelihood of prevailing at the transfer hearing until after he had evaluated the Defendant. Yet, Counsel did not request this evaluation before deciding to waive this issue. Moreover, Counsel's claim at the post-conviction hearing that he decided to delay the Defendant's evaluation in order to keep it out of the prosecution's hands for as long as possible seems likely to be after-the-fact rationalization. Certainly, as acknowledged by Counsel himself, the trial court was not going to allow the defense to ambush the prosecution in this manner. Indeed, Counsel admitted that, once he filed a notice with the trial court to use Dr. Miller as an expert, the trial court would "allow the state to get a last minute evaluation if a mental health defense was raised." Similarly, we are confident that, once Counsel complied with his pre-trial obligations, the trial court would have given the State as much time as necessary to develop its rebuttal proof. Thus, we are unpersuaded that Counsel's failure to present a mental health defense against transfer was a strategic decision based on adequate investigation, and therefore worthy of deference by this Court. See State v. Townes, 56 S.W.3d 30, 42 (Tenn. Crim. App. 2000), overruled on other grounds by State v. Terry, 118 S.W.3d 355, 358 (Tenn. 2003), (noting that "this court's deference to counsel's tactical decisions will depend upon counsel's adequate investigation of defense options.")

---

[7](...continued)
State v. Ballard, 855 S.W.2d 557, 560 (Tenn. 1993); Tenn. R. App. P. 24(b).

Notwithstanding our conclusion that Counsel's performance was deficient in this regard, we must conclude that the Defendant has failed to prove by clear and convincing evidence that she was prejudiced by this error by her lawyer. As set forth above, because the Defendant was seventeen at the time of the offenses, the juvenile court was required to order her transfer if it found only "reasonable grounds to believe" that the Defendant was not committable. Although Dr. Miller testified at the post-conviction hearing that the Defendant <u>was</u> committable at the time of the hearing, Dr. Larkin had concluded that she was not. Thus, even if Dr. Miller had testified at the transfer hearing, the juvenile court had sufficient proof before it to conclude that transfer was necessary. Moreover, in its Findings and Recommendations, the juvenile court found the following:

> 1. That the offenses were committed in an aggressive and premeditated manner against both persons and property[; and]
> 2. That pursuant to testimony of State personnel of State agencies, that sources available to the State of Tennessee are limited, to such a degree, that possible rehabilitation of said child is not viable considering the gravity of the offenses and conduct in which said child engaged.

The Defendant does not contend that her lawyer's performance was responsible for these two findings, or that he could have done something to prevent the juvenile court from making these findings. Yet, in making the determination of the Defendant's committability, the juvenile court was required to consider the manner in which the offenses were committed, and whether or not a commitment would have resulted in rehabilitation. <u>See</u> Tenn. Code Ann. § 37-1-134(b)(4), (5) (1996). The juvenile court's findings on these two points, together with Dr. Larkin's opinion that the Defendant was <u>not</u> committable, convince us that the result of the transfer hearing would have been the same whether or not Dr. Miller had testified. That is, the Defendant was not prejudiced by Counsel's failure to have her evaluated by Dr. Miller prior to the transfer hearing. The Defendant has failed to establish that she has suffered from the ineffective assistance of counsel on this ground.

In conjunction with this issue, the Defendant also points out that Counsel's failure to adduce proof at the transfer hearing of her committability served to waive her ability to appeal the juvenile court's order of transfer on this ground. Again, we agree with the Defendant that Counsel's decision to waive the issue of the Defendant's committability was deficient. However, the Defendant's decision to plead guilty also served to waive any right to appeal the juvenile court's decision. As set forth below, we have determined that the Defendant's guilty plea was valid. Accordingly, her lawyer's failure in this regard became irrelevant. This issue is without merit.

The Defendant also complains that Counsel performed inadequately in developing a defense strategy by failing to gather expert proof concerning the Defendant's state of mind at the time the murders were committed. The Defendant testified that Counsel never spoke to her about the "defense" of diminished capacity. Dr. Miller testified that he did not investigate the Defendant's state of mind at the time of the crimes. Counsel testified that he did investigate a diminished capacity "defense" and discussed it with Dr. Miller. The trial court accredited Counsel's testimony

on this point. We note, however, that Dr. Miller's actual report does not speak specifically to the Defendant's state of mind as of the time of the offenses.[8]

> Our supreme court has recognized that
> a defendant's capacity to form the requisite mental state to commit an offense is an issue in criminal prosecutions because the general criminal law in Tennessee provides that "[n]o person may be convicted of an offense unless . . . [t]he culpable mental state required is proven beyond a reasonable doubt."

State v. Hall, 958 S.W.2d 679, 689 (Tenn. 1997) (quoting Tenn. Code Ann. § 39-11-201(a)(2)). Thus, a defendant may seek to negate his or her criminal culpability for a given offense by adducing proof that he or she lacked the requisite mental state to commit the offense. See id. For instance, a defendant accused of committing first degree premeditated murder may seek to adduce proof that she committed the killing knowingly, but not intentionally: thereby committing second degree murder rather than first degree premeditated murder. Compare Tenn. Code Ann. § 39-13-202(a)(1) with § 39-13-210(a)(1).

In this case, the Defendant maintains that a proper psychological evaluation prior to trial would have established that, at the time of the offenses, she lacked the intent to commit either first degree felony murder or first degree premeditated murder. She points to Dr. Auble's testimony that, in her opinion, "at the time of the crime [the Defendant] was knowing, in that she was aware of what was happening, but she was not -- did not have a capacity to participate in it or to stop the proceedings." The Defendant argues that, had Counsel developed this proof prior to her guilty plea, he "would have recognized that [the Defendant] had a good chance of being convicted of facilitation of felony murder at trial," and would therefore have advised her not to enter a guilty plea to three counts of first degree murder.[9]

---

[8] The record before us contains a six-page typewritten document on Dr. Miller's letterhead titled "Psychological Evaluation"; a two-page typewritten document on Dr. Miller's letterhead titled "Synopsis of Karen Howell Evaluation"; and a nine-page typewritten document titled "Dr. L. M. Miller, Phd Notes" which is the transcription of Dr. Miller's handwritten notes. It is only this latter document which contains any reference to the Defendant's state of mind at the time of the offenses. That reference consists of a paragraph titled "[Defendant] [g]oes through events of 4/6/1997" and continues, "[s]he comes across as trying to escape from her troubled life. She took all her money (she had saved $650 for a car) and was expecting for the group to go to New Orleans. By [the time] they got to rest stop she was almost having an out-of-body experience. Felt her mind was separated from her body. Wanted to call her mother and go home but was afraid to because didn't know why afraid because didn't expect the others to turn on her if she wanted out."

[9] Our criminal code provides that "[a] person is criminally responsible for the facilitation of a felony if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony." Tenn. Code Ann. § 39-11-403(a). Our Supreme Court has instructed us that the offense of facilitation of felony murder requires proof that (1) a killing was committed during the commission of the underlying charged felony; (2) the defendant knew that another person intended to commit the underlying felony, but did not have the intent to promote or assist the commission of the underlying felony, or to benefit in its proceeds or results; (3) the defendant furnished substantial assistance to that person in the commission of the underlying felony; and (4) the defendant furnished that assistance knowingly. See State v. Ely,

(continued...)

The trial court considered Dr. Auble's testimony and found it "not credible." This Court does not second-guess a fact-finder's assessments of credibility. See, e.g., State v. Honeycutt, 54 S.W.3d 762, 766-67 (Tenn. 2001) (recognizing that, in post-conviction proceedings alleging ineffective assistance of counsel, "appellate courts do not substitute their own inferences for those drawn by the trial court, and questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial judge.") Moreover, we are not persuaded that, even had Counsel developed this line of proof, and even had he advised the Defendant that she should go to trial, the Defendant would have followed this advice. As set forth more fully below, the proof establishes that the Defendant pled guilty in order to save her codefendants from facing the death penalty, to better her chances at obtaining a lenient sentence, and to save herself from the ordeal of a trial. The proof simply does not support the Defendant's contention that she would not have pled guilty had her lawyer developed psychological proof similar to that compiled by Dr. Auble. Again, the Defendant has failed to establish that she was prejudiced by her lawyer's performance in this regard.[10]

The Defendant complains that Counsel did not adequately prepare her to plead guilty and did not adequately explain to her all of the ramifications about her choice between pleading guilty and proceeding to trial. Counsel testified to the contrary on this issue and the trial court accredited Counsel's testimony. The evidence does not preponderate against the trial court's finding in this regard.

The Defendant also complains about Counsel's failure "to object to or argue against the group plea offer." As noted by the State in its brief, however, Tennessee recognizes "package-deal" plea agreements. See, e.g., Parham v. State, 885 S.W.2d 375, 382-84 (Tenn. Crim. App. 1994). Indeed, this Court has already ruled that the package-deal plea offer in this case was valid. See Jason Blake Bryant v. State, No. E2002-00907-CCA-R3-PC, 2004 WL 443414, at *11-12 (Tenn. Crim. App., Knoxville, Mar. 11, 2004). See also Joseph Lance Risner v. State, No. E2002-01112-CCA-R3-PC, 2003 WL 21492929, at *5-7 (Tenn. Crim. App., Knoxville, June 30, 2003); Natasha W. Cornett v. State, No. E2002-00034-CCA-R3-PC, 2002 WL 31174214, at *6 (Tenn. Crim. App., Knoxville, Sept. 30, 2002); Crystal Rena Sturgill v. State, No. E2002-00385-CCA-R3-PC, 2003 WL 239743, at *4 (Tenn. Crim. App., Knoxville, Feb. 4, 2003). Counsel committed no error in not objecting to the form of the offer. Moreover, we note the undisputed testimony by Counsel that he did try to negotiate a better deal for his client with the prosecution after he received the offer. This contention is without merit.

The Defendant next asserts that, had he been competent, Counsel would have advised her not to plead guilty to first degree murder and attempted first degree murder, because she had nothing to

---

[9](...continued)
48 S.W.3d 710, 719-20 (Tenn. 2001).

[10]Indeed, we are struck by the fact that, nowhere in the Defendant's testimony does she assert that, had her lawyer told her "x" or "y," she would have insisted on going to trial. Rather, the proof supports the trial court's finding that the Defendant was determined to accept the State's offer "whatever it took."

gain thereby. Counsel should have instead insisted on her taking her chances with a jury and hoping for convictions of lesser offenses. Again, however, the balance of the proof supports the conclusion that the Defendant pled guilty to save her friends from the death penalty, to escape the ordeal of a trial, and in hopes that the judge would prove more lenient at sentencing than the jury. The Defendant has failed to establish that she would have refused to plead guilty even had her lawyer insisted that she go to trial. Accordingly, she has failed to establish that she is entitled to relief on this claim of ineffective assistance of counsel.

We are similarly unpersuaded that the Defendant was prejudiced by her lawyer's alleged failure to properly explain lesser-included offenses and/or the potential sentences she was facing by trial or plea. The Defendant wanted to accept the State's offer: not as a result of the legal advice she was receiving, but as a result of her relationships with the other defendants, her understandable dread of a jury trial, and in hopes that a judge would be more merciful than a jury -- all valid and practical and realistic concerns.

The Defendant complains that her lawyer was ineffective in failing to inform the trial court about her intellectual and psychological impairments prior to the guilty plea hearing, such that the trial court could individualize its colloquy with her. As set forth below, this Court has previously held that the trial court erred when it conducted the guilty plea hearing with all six defendants responding simultaneously. Further, we agree with the Defendant that Counsel should have informed the trial court that the Defendant had certain difficulties in processing information, so that the trial court could have taken these difficulties into account when questioning the Defendant about her plea. Nevertheless, we conclude later in this opinion that the trial court's error in this regard was harmless beyond a reasonable doubt. Thus, we find that the Defendant suffered no prejudice by her attorney's failure in this regard.

Finally, the Defendant contends that her lawyer was ineffective in his representation of her at the sentencing hearing in that he "failed to effectively develop mitigating evidence that could have lessened her sentence upon conviction." The Defendant fails to tell us, however, of what this undeveloped evidence consists. Dr. Miller's report was admitted at the sentencing hearing. Counsel also called two of the Defendant's friends and two of her family members to testify. The Defendant did not call any witnesses at the post-conviction hearing who she contends should have been called during the sentencing hearing. To the extent that the Defendant implies that Counsel should have hired and called Dr. Auble or a counterpart, we note that the trial court found this testimony "not credible," and we therefore fail to see how such proof would have reduced the Defendant's sentence. The trial judge -- who presided over both the sentencing hearing and the post-conviction hearing -- noted that he found more mitigating factors in favor of the Defendant than any of her codefendants. The Defendant has failed to demonstrate that her lawyer's performance in this regard was either deficient or prejudicial. We similarly reject the Defendant's contention that her lawyer's closing argument at the sentencing hearing constituted ineffective assistance of counsel. We are confident that the trial court made its sentencing decision based on the evidence presented at the sentencing hearing, and would have made the same decision regardless of the level of eloquence attained by Counsel during final argument. This contention has no merit.

In sum, we agree with the Defendant that Counsel's performance with regard to the transfer hearing was deficient, but find that the Defendant suffered no prejudice thereby. In all other respects, we hold that the Defendant has failed to establish by clear and convincing evidence that, but for her lawyer's alleged failures to provide her with adequate legal advice, there is a reasonable probability that she would have refused to plead guilty and would have insisted on going to trial. Accordingly, the Defendant is not entitled to post-conviction relief on the basis of ineffective assistance of counsel.

## II. ADMISSIBILITY OF EXPERT TESTIMONY

In conjunction with her allegations of ineffective assistance of counsel, the Defendant complains that the trial court erred in refusing to admit expert testimony as part of her proof about Counsel's performance. At the post-conviction hearing, the Defendant proffered the testimony of attorney W. Thomas Dillard as an expert on the issue of the quality of Counsel's legal representation of the Defendant. The trial court had previously ruled this evidence inadmissible. The Defendant now contends that the trial court erred in refusing to admit this proffered expert testimony.

Our Rules of Evidence provide that "[i]f scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Tenn. R. Evid. 702. In this case, the Defendant wanted Mr. Dillard to testify about his "specialized knowledge" concerning the effective representation of criminal defense clients. In ruling Mr. Dillard's testimony inadmissible, the trial judge stated,

> This Court [has] ten (10) years experience as a criminal defense lawyer, over twenty-five (25) years as a criminal court judge and a working knowledge of the standards imposed by Baxter v. Rose, 523 S.W.2d 930 (Tenn. 1975), and other relevant cases, [and] does not need the assistance of an expert in determining the issue of ineffective assistance of counsel. This court knows the standards and how to apply them.

While the Defendant does not quibble with the trial judge's experience, she does postulate that the trial judge's "notions of what constitutes competent representation may be frozen in time." For this reason, she argues, the trial judge erred in not admitting Mr. Dillard's testimony in order to provide him with substantial assistance in determining whether Counsel performed effectively.

Our supreme court instructs us that "[q]uestions regarding the qualifications, admissibility, relevancy, and competency of expert testimony are matters left within the broad discretion of the trial court." State v. Stevens, 78 S.W.3d 817, 832 (Tenn. 2002). This Court will not overturn a trial court's ruling on the admissibility of expert testimony absent a finding that the trial court abused its discretion in admitting or excluding same. Id. This Court should find an abuse of discretion only where it appears that "'the trial court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining.'" Id. (quoting State v. Shuck, 953 S.W.2d 662, 669 (Tenn. 1997)). We find no such abuse of discretion here.

This Court reviews many appeals of post-conviction cases dealing with claims of ineffective assistance of counsel. In the vast majority of these cases, the trial court has made an informed and correct decision, even without the type of expert testimony advocated as necessary by the Defendant. And although the Defendant states in her brief that "appellate court judges generally are not legal experts on current standards of criminal defense practice," this Court manages to dispose of these cases on appeal without the "substantial assistance" of expert testimony by criminal defense lawyers in the records. Indeed, the Defendant has not cited us to a single case in which the post-conviction court was found to be in error for refusing to admit such testimony. Rather, she relies on cases dealing with claims of civil malpractice. We are not persuaded: Strickland and Baxter do not address claims of civil malpractice, and neither case, nor their progeny, imply that expert testimony is necessary for the resolution of a claim of ineffective assistance of counsel.

The trial court did not abuse its discretion in refusing to admit Mr. Dillard's testimony. This issue is without merit.

## III. CONSTITUTIONAL VALIDITY OF THE DEFENDANT'S GUILTY PLEA
### A. Applicable law
The Defendant also contends that she is entitled to post-conviction relief because her guilty pleas do not pass constitutional muster. Specifically, she asserts that she did not enter her guilty pleas voluntarily, knowingly, and intelligently, as required by Boykin v. Alabama, 395 U.S. 238 (1969) and State v. Mackey, 553 S.W.2d 337 (Tenn. 1977). We disagree.

Boykin is the seminal case in federal jurisprudence dealing with the constitutional validity of a guilty plea by a criminally accused. Boykin recognized that, upon entering a plea of guilt, a criminal defendant waives several fundamental federal constitutional rights: the privilege against self-incrimination, the right to trial by jury, and the right to confront one's accusers. See 395 U.S. at 243. The Boykin court held that,

> "[f]or this waiver to be valid under the Due Process Clause, it must be 'an intentional relinquishment or abandonment of a known right or privilege.' Johnson v. Zerbst, 304 U.S. 458, 464, 466 (1938). Consequently, if a defendant's guilty plea is not equally voluntary and knowing, it has been obtained in violation of due process and is therefore void. Moreover, because a guilty plea is an admission of all the elements of a formal criminal charge, it cannot be truly voluntary unless the defendant possesses an understanding of the law in relation to the facts."

Id. at n.5 (quoting McCarthy v. United States, 394 U.S. 459, 466 (1969)). To assess whether a defendant's plea is equally voluntary and knowing, Boykin requires a trial court, before it accepts a plea of guilt, to "canvass[] the matter [on the record] with the accused to make sure he has a full understanding of what the plea connotes and of its consequence." 395 U.S. at 244. Only through such colloquy can the trial court, and any subsequent reviewing court, determine whether the accused is intentionally relinquishing his or her constitutionally protected rights. See id. at 242-243. Thus, our own supreme court has recognized that "the record of acceptance of a defendant's plea of guilty

must affirmatively demonstrate that his decision was both voluntary and knowledgeable, i.e., that he has been made aware of the significant consequences of such a plea; otherwise, it will not amount to an 'intentional abandonment of a known right.'" Mackey, 553 S.W.2d at 340. Furthermore, a trial court "shall not accept a plea of guilty without first, by addressing the defendant personally in open court, determining that the plea is voluntary and not the result of force or threats or of promises apart from a plea agreement." Id. at 341.

> In Blankenship v. State, our supreme court recognized that
> a plea of guilty cannot be voluntary in the sense that it constitutes an intelligent admission that the accused committed the offense unless the accused has received "real notice of the true nature of the charges against him, the first and most universally recognized requirement of due process."

858 S.W.2d 897, 904 (Tenn. 1993) (quoting Marshall v. Lonberger, 459 U.S. 422, 436 (1983)). "Hence, there must be a full explanation of the offense to which the defendant is pleading and 'nothing to indicate that he was incompetent or otherwise not in control of his mental facilities' at the time the plea is entered." Id. (quoting Brown v. Perini, 718 F.2d 784, 788 (6th Cir. 1983). Moreover, in addition to an understanding of the charges, the accused must be aware of the direct consequences of his or her guilty plea. See id. at 905. "The standard was and remains whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant." North Carolina v. Alford, 400 U.S. 25, 31 (1970).

> When applying these principles to a particular defendant who has offered a particular plea, a court charged with determining whether [a guilty plea was] "voluntary" and "intelligent" must look to various circumstantial factors, such as the relative intelligence of the defendant; the degree of his familiarity with criminal proceedings; whether he was represented by competent counsel and had the opportunity to confer with counsel about the options available to him; the extent of advice from counsel and the court concerning the charges against him; and the reasons for his decision to plead guilty, including a desire to avoid a greater penalty that might result from a jury trial.

Blankenship, 858 S.W.2d at 904. The focus of the knowing and voluntary inquiry is "whether the defendant actually does understand the significance and consequences of a particular decision and whether the decision is uncoerced." Godinez v. Moran, 509 U.S. 389, 401 n.12 (1993). A guilty plea is not voluntary if it is the product of "[i]gnorance, incomprehension, coercion, terror, inducements, [or] subtle or blatant threats . . . ." Boykin, 395 U.S. at 242-3.

### B. Analysis

We will first address the Defendant's contention that her guilty plea was not voluntary because the plea bargain offered by the State was coercive. That offer required the Defendant to, inter alia, plead guilty to three counts of first degree murder and one count of attempted first degree murder. Sentencing for these offenses would then be left to the trial court's discretion after a

sentencing hearing. The State would drop its request for the death penalty as to the four adult defendants. This offer, according to the Defendant, placed her "in a position of extreme coercion. [She] had the burden of her four adult codefendants, all of whom were her close friends, facing the probability of the death penalty if she did not go along with the plea agreement. No juvenile[11] should be forced to shoulder such a burden." The Defendant further contends that the last-minute timing of the offer[12] added to its coercive effect, and that "[w]hat the State did was the equivalent of placing a gun to the adult codefendants' heads and forcing [the Defendant] to accept the package deal plea agreement if she wanted to prevent their deaths." The Defendant argues that she received no proper consideration for accepting the offer. Without citation, she urges this Court to hold the State's "tactics" as "void and . . . per se unduly coercive as a matter of constitutional law."

We are sympathetic to the Defendant's argument that four of her codefendants had far more at stake in this matter than did she. We are also sympathetic to her argument about the amount of pressure she felt relative to standing between her friends and the death penalty. Nevertheless, this Court has already determined that the plea offer made in this case was not unconstitutional, even as to the other juvenile. See Jason Blake Bryant v. State, 2004 WL 443414, at *11-12. See also Joseph Lance Risner v. State, 2003 WL 21492929, at *7-9; Natasha W. Cornett v. State, 2002 WL 31174214, at *6; Crystal Rena Sturgill v. State, 2003 WL 239743, at *4. As we stated in the Sturgill case,

> Plea offers by the state may legitimately require that all codefendants agree before the offer is extended to any defendant, and such a contingency does not equate with a coerced guilty plea. See, e.g., Parham v. State, 885 S.W.2d 375 (Tenn. Crim. App. 1994). In this respect, the fact that the petitioner's concern for Dean Mullins played a part in her decision to plead guilty does not negate the validity of her plea. Many factors other than the facts may legitimately influence a decision to plead guilty, such as, reduction of stress on a defendant and his or her family, the removal of certain consequences, and reduction of actual exposure.

Crystal Rena Sturgill, 2003 WL 239743, at *4. Accordingly, we reject the Defendant's invitation to find the plea offer unconstitutionally coercive on its face.

Of course, our disinclination to find the plea bargain offer per se coercive does not resolve the issue of whether it was coercive as to the Defendant. In this regard, the Defendant urges us to undertake the "totality of the circumstances" inquiry set forth in In re Ibarra, 34 Cal. 3d 277, 666 P.2d 980, 193 Cal. Rptr. 538 (1983), including the "special scrutiny" of several specific factors. This Court has previously considered Ibarra in this context, however, and, while recognizing that several of the factors may be relevant, declined to adopt Ibarra as the model. See Joseph Lance Risner, 2003 WL 21492929, at *5. We see no reason to take a different approach now.

---

[11] In point of fact, the Defendant was no longer a juvenile when faced with the plea bargain offer.

[12] Jury selection was scheduled to begin shortly after the plea offer was made.

In reviewing the circumstances surrounding the State's plea offer, we find that it was not coercive as to the Defendant. The State did not misrepresent any facts to the Defendant in order to induce her plea, and had a reasonable and good faith case against the codefendants against whom the death penalty was being sought. Cf. Ibarra, 666 P.2d at 987 (specifying one of the relevant factors as whether the inducement for the plea is proper). There were sufficient facts developed during the State's investigation of the crimes to support the Defendant's guilty plea. Cf. id. (listing a second factor as whether there is a factual basis for the guilty plea). The proof also demonstrates that the Defendant was motivated to plead guilty for reasons in addition to removing the possibility of the death penalty as to her friends. The Defendant testified at the post-conviction hearing that she decided to accept the plea bargain not only to keep four of her codefendants from facing the death penalty, but in hopes that she would receive a more lenient sentence from the court. Counsel testified that, during his discussions with the Defendant about the offer, she told him "she simply wanted a chance one day to get out [of prison], just a chance." There is also proof in the record that the Defendant wanted to avoid the ordeal of a trial. Counsel testified that the Defendant told him she wanted to plead "to get this over with." Counsel further stated that the Defendant told him that she did not want her family present at the guilty plea hearing because she was "ashamed" and did not want "to face her family." Indeed, at the subsequent sentencing hearing, when Counsel called the Defendant to testify, he first informed the court, "Your honor, my client has asked me if her family could just leave the courtroom. . . . [S]he doesn't want to testify in front of them." The potential humiliation attendant upon a trial is, of course, far greater than that attendant upon a plea of guilt and/or a sentencing hearing.

The Defendant raises the point that she had nothing to gain from her guilty plea, because she could have waived jury sentencing if and when a jury found her guilty of the crimes to which she pled. This argument overlooks the significance which sentencing courts frequently place upon a defendant's decision to accept responsibility for his or her actions and plead guilty. Trial courts often grant some leniency following a guilty plea that would not be available upon a jury verdict of guilt. The Defendant's hope for judicial mercy upon her plea was, we find, not without some basis in reality. That she ended up with the most severe sentence possible at the end of her sentencing hearing does not imply that her hope for leniency was mere fantasy.

The Defendant was faced with a heart-wrenching choice. Her family counseled her against pleading guilty. Her lawyer initially advised her not to take the plea bargain, in hopes that he could negotiate a better offer. The Defendant had two days in which to consider her options and discuss matters with her lawyer. Her alternative was to go to trial and face twelve of her peers -- all of whom would hear the facts of the case and see the horrific photographs of the victims, photographs that the Defendant herself refused to look at. She would have faced being found guilty of the same offenses to which she pled, and would have faced the same sentences she eventually was ordered to serve. Additionally, her codefendants would have faced the death penalty. In short, while the Defendant may have found herself on the horns of a dilemma, the record supports the trial court's conclusion that the choice she eventually made was not the result of coercion by the State. This issue is without merit.

The Defendant also argues that, in pleading guilty to three counts of first degree murder, she "branded herself" a dangerous felon and admitted to three aggravating circumstances, thereby giving the sentencing court the authority to impose three consecutive sentences of life imprisonment without the possibility of parole. She contends that "[n]o defendant with a proper knowledge and understanding of this fact would have voluntarily entered a guilty plea," because she "had a chance of being convicted of lesser included offenses" had she chosen instead to go to trial. More emphatically, she declares that "[i]t is impossible to believe that a defendant in [her] position would have entered a guilty plea and submitted herself to a life sentence had she fully understood her situation or had the coercion involved with the package deal not been present." This argument is a reiteration of the Defendant's basic one: that she had nothing to lose by going to trial, and nothing to gain by pleading guilty. Therefore, we should ipso facto find her plea involuntary, unknowing, and constitutionally invalid.

We find this argument unpersuasive. The Defendant's decision to plead guilty was, in the final analysis, her own. Whether she made the same choice that someone else would have made is irrelevant. Our inquiry is limited to whether she made the choice after having been fully informed of the nature of the charges against her and the ramifications of pleading guilty, in such a manner that she understood the information being provided. This Court does not assess a defendant's decision to plead guilty on the basis of what "no" defendant would have done, given a full understanding of the plea. A defendant may validly choose to plead guilty to the highest crimes charged, even without an agreement as to the sentence. To argue that "no" defendant would do so is misplaced rhetoric. This contention is without merit.

The Defendant also contends that her plea was not intelligent. The Defendant submitted proof at the post-conviction hearing that, at the time of her guilty plea, she was functioning "within the borderline retarded range of intelligence," according to Dr. Miller's report. However, Dr. Miller's report also noted that the Defendant was "not suffering from primary mental retardation and in point of fact has the potential to function within the average range of intelligence." Dr. Miller testified that the Defendant's I.Q. would have had no effect on her ability to enter a voluntary, knowing plea of guilty, nor would it affect her ability to assist her lawyer in her defense. Dr. Auble's report indicated that, in July 2002, the Defendant's "[i]ntellectual abilities fell within the low average range" and that her performance I.Q. was fourteen points higher than that obtained by Dr. Miller. Dr. Auble termed this "a significant improvement" and opined that the earlier, lower test result may have been due to the Defendant's significant distress at the time. The record further indicates that the Defendant has obtained her GED while incarcerated subsequent to her plea. In our view, these indicia are sufficient to support the trial court's finding that the Defendant had sufficient intelligence to enter a valid guilty plea.

The Defendant also points to evidence of her emotional and psychological difficulties as proof that she was unable to enter a valid guilty plea. Dr. Miller's report states that the Defendant "does not have a[n] auditory deficit but she does have difficulty attending to information that is presented auditorily. She particularly has difficulty when any level of complexity is added." The report further provides that the testing data indicated that the Defendant was "suffering from a

significant emotional disturbance characterized by her tenuous contact with reality[,] indications of paranoid ideation and clear indications of fragmented and confused thinking. Under pressure her thinking deteriorates even more rapidly . . . ." Dr. Miller testified at the post-conviction hearing that, in his opinion, the only way the Defendant could have entered her guilty plea voluntarily, knowingly and intelligently was if she had had a previous "extensive conversation" about the plea and all of its ramifications. Dr. Auble was more blunt: she testified that "[The Defendant's] mental and emotional state at that time [of the plea hearing] was sufficiently impaired that her entering the plea was not in a knowing and voluntary fashion."

The Defendant testified that Counsel read the Waiver of Rights and Plea of Guilty document to her before she signed it, but she could not remember whether he explained to her any of her constitutional rights. She stated that she did not ask him any questions about it. She stated that Counsel did not discuss many of the sentencing aspects involved.

Counsel insisted that he discussed the plea in exhaustive detail with the Defendant and that she appeared to understand it.

The trial court found that the Defendant and Counsel "did in fact have extensive conversations about every aspect and consequence of the plea." The court further found that "[the plea] was explained [by the court] in great detail and in simple language what the defendants were pleading guilty to and the sentences that could be imposed and the petitioner said she understood. There is no reason to believe that she did not." Finally, the court found that the Defendant, "at all times she has testified, has demonstrated an ability to understand statements made to her and questions asked of her, and has been able to communicate well."

The Defendant's argument is that, given her particular psychology and the particular circumstances surrounding her guilty plea, including her lawyer's performance and the fact that the trial court addressed all of the defendants jointly at the guilty plea hearing, she was incapable of entering a constitutionally valid guilty plea. In this proceeding, she must prove this contention by clear and convincing evidence. We conclude that she has failed to do so. The Defendant's argument depends upon the trial court accrediting her testimony and that of her experts, and discrediting the testimony of Counsel. However, the trial court did just the opposite. The trial court made a specific finding that Dr. Auble's testimony was "not credible." Further, the trial court accredited Counsel's testimony that he discussed extensively the guilty plea with the Defendant and that she understood it. Certainly, the Defendant's performance at the post-conviction hearing does not bolster her argument that she is without the capacity to understand complex legal proceedings and terminology. See Moten v. State, 935 S.W.2d 416, 422 (Tenn. Crim. App. 1996) (recognizing that, in determining whether a defendant's guilty plea is knowing and voluntary, the reviewing court "may consider any relevant evidence in the record of the proceedings, including post-conviction proceedings.") In short, the record does not support the Defendant's contention that she was incapable of entering a valid plea due to her mental and emotional state, and this issue is therefore without merit.

As set forth above, upon a challenge to the validity of a guilty plea, we must examine the surrounding circumstances, including the Defendant's relative intelligence, the degree of her familiarity with criminal proceedings, whether she was represented by competent counsel and had adequate opportunity to confer with him, the extent of the advice she received from her lawyer and the trial court regarding the charges against her, and her reasons for deciding to plead guilty. See Blankenship, 858 S.W.2d at 904. We have determined that the Defendant was sufficiently intelligent to enter a valid guilty plea. As to her familiarity with criminal proceedings, it is undisputed that this case was the Defendant's introduction to our criminal justice system. Nevertheless, by the time of the plea bargain offer, the Defendant had been "in the system" for almost a year. During this time, she had extensive contact with her lawyer and had experienced the juvenile court proceedings attendant upon her transfer to criminal court. While not a seasoned veteran of criminal proceedings, the Defendant did have some significant exposure to them by the time she entered her plea. We have previously discussed the Defendant's reasons for pleading guilty and determined that she did not do so as the result of coercion or other improper basis.

The quality of the Defendant's legal representation is, of course, a major bone of contention in this matter. The Defendant contends that her lawyer was ineffective in his advice to her regarding the State's offer. The trial court, however, credited the lawyer's testimony in this regard, finding that counsel investigated every possible defense and discussed same with the Defendant; he "talked with the [Defendant] in great detail about all aspects of [the] plea and the consequences thereof"; he did not "agree for her to plead guilty until he was certain she fully understood what she was doing and that it was in her best interest"; and that counsel and the Defendant "did in fact have extensive conversations about every aspect and consequence of the plea," including discussion of the charges, lesser-included offenses, possible punishments, and the rights and waivers implicated in a plea. While the Defendant strenuously argues that counsel's performance in this regard was deficient, we disagree. Although counsel for the Defendant was certainly inexperienced relative to the other defense attorneys working on this case, the record supports the trial court's finding that counsel spent a great deal of time and effort reviewing and re-reviewing with the Defendant all of the issues incident to the State's offer. The Defendant knew that, by pleading guilty, she was giving up any hope that a jury might convict her of lesser offenses. She knew that, by pleading guilty, her potential benefit was limited to a hope that the trial court would be lenient in sentencing her, but that, even so, she would be spending at least fifty-one years in prison. We have no doubt that the Defendant's lawyer did everything in his power to educate the Defendant about what she was doing. Counsel's representation of the Defendant with respect to the State's offer weighs in favor of the validity of the Defendant's plea.

We turn now to the manner in which the Defendant's pleas of guilt were taken and the extent of her interaction with the trial court. On February 20, 1998, the Defendant signed a Waiver of Rights and Plea of Guilty which provided that she was pleading guilty to one count of attempted first degree murder, three counts of first degree felony murder, two counts of especially aggravated kidnapping, two counts of aggravated kidnapping, and one count of theft over $1,000. The Plea provided that sentencing for the attempted murder and the murder convictions would be set by the

trial court; the effective twenty-five year sentence for the remaining convictions was to run concurrently therewith.

Later that day, the trial court convened a hearing in order to take the Defendant's guilty pleas as well as those of the other defendants. Rather than take the pleas individually, however, the trial court had all six of the defendants gather together before the bench. The trial court swore in the defendants as a group, and then addressed them together:

> I need you all . . . thank you, you all did speak loudly and everyone spoke and answered that question [as to being sworn in], all six defendants.
> Some questions, I can ask you jointly and again, I would ask you all to speak loudly and clearly and I will indicated [sic] that you have all answered for the record, and some questions I will need to ask you individually, and I will have to start out by asking you a few questions individually.

The court then proceeded to inquire individually as to each defendant's name, level of education, and whether he or she could read and write without difficulty. The remaining questions asked of the Defendant were done so in a group colloquy, with the court reporter indicating the responses by noting in the record either "All defendants answered affirmatively" or "All defendants answered negatively." The only other question to which the trial court required an individual response from each defendant was, "Are you all pleading guilty because you are guilty?" The Defendant responded, "Yes" to this query.

This Court has previously held that this en masse allocution was insufficient and did not meet the requirements of Boykin and State v. Neal, 810 S.W.2d 131 (Tenn. 1991), overruled on other grounds, Blankenship, 858 S.W.2d at 902, because the trial court "did not receive individual, identified responses to each question" asked by the trial court. See Joseph Lance Risner, 2003 WL 21492929, at *9. See also Jason Blake Bryant, 2004 WL 443414, at *12. The State contends that this Court's previous opinions in Risner and Bryant were in error on this issue, and that "[t]hose opinions apply the requirements of Boykin and Neal too broadly, recognizing a constitutional error where none exists." We disagree and elect to follow our previous holdings. The State also contends that, even if we find the mass allocation to present constitutional error cognizable in a post-conviction proceeding, the issue has been waived in this case because it "is being raised by this defendant for the first time on appeal from the denial of her post-conviction petition." As pointed out by the Defendant in her Reply Brief, however, this contention is incorrect. The Defendant raised this issue in her Amended Petition for Post-Conviction Relief. We choose to address the issue on its merits. Accordingly, we must determine whether the trial court's error in this regard as to the Defendant was harmless beyond a reasonable doubt. See Neal, 810 S.W.2d at 138; Joseph Lance Risner, 2003 WL 21492929, at *9.

As the Supreme Court pointed out in Boykin,

-34-

What is at stake for an accused facing death or imprisonment demands the utmost solicitude of which courts are capable in canvassing the matter with the accused to make sure he has a full understanding of what the plea connotes and of its consequence. When the judge discharges that function, he leaves a record adequate for any review that may be later sought and forestalls the spin-off of collateral proceedings that seek to probe murky memories.

395 U.S. 243-44 (citations omitted). Because the trial court did not individually question each defendant in this case, the record of the plea submission hearing does not, in and of itself, establish the voluntary, knowing and intelligent nature of the Defendant's plea. Thus, as pointed out by the Defendant, we are forced to rely on "murky memories" and the proof adduced at the post-conviction hearing, in addition to the record of the submission hearing itself.

The memories with which we must contend are, of course, the Defendant's and her lawyer's. We must also contend with the post-conviction court's determination that the Defendant's testimony at the post-conviction hearing was less credible than that of her lawyer. As set forth above, we have determined that the Defendant possessed the requisite intelligence at the time of her plea to be capable of entering a plea of guilt. As also set forth above, we have further determined that the Defendant's decision to plead guilty was not the result of coercion. The key issue, then, with respect to the validity of the Defendant's plea in the context of the mass allocation was whether she understood what she was doing to the requisite degree. Only if the record demonstrates that she sufficiently understood to what she was pleading, all of the ramifications of her plea, and the rights that she was thereby abandoning, can we uphold her plea.

Counsel was adamant about his repeated and extensive conversations with the Defendant about her plea. The post-conviction court accredited this testimony. Dr. Miller testified that, so long as she had adequate preparation prior to the guilty plea hearing, the Defendant was capable of comprehending the proceeding. The Defendant claimed during her testimony that she was not "sure" if her lawyer explained her constitutional rights prior to the plea hearing; that he did not review with her what questions to expect from the trial court; and did not review with her a number of issues regarding sentencing. The trial court found this testimony unpersuasive. Moreover, we find it significant that nowhere in her post-conviction testimony did the Defendant claim that she did not understand what she was doing, did not understand what her alternative was, or did not understand the consequences of her decision. Nor did she testify that, had she had a more thorough understanding of what her guilty plea meant, she would have chosen instead to go to trial. Cf. Glenn Beeler v. State, No. 01C01-9010-CR-00265, 1991 WL 181034, at *4 (Tenn. Crim. App., Nashville, Sept. 16, 2001) (Tipton, J., concurring, finding that group plea passed constitutional muster even with "no direct evidence that the petitioner understood his right against compulsory self-incrimination or the effect of his plea thereon," in part because "petitioner did not testify [at the post-conviction hearing] that he was not aware of this right nor did he state that he would have gone to trial if he had been aware of it.")

The trial court made the following findings relative to this issue:

Although it was not the usual practice of this court, all defendants agreed to plead guilty at the same time.

This court started by asking questions individually and made certain that all responded in an understanding way to each question asked jointly.

When asked if they had had any alcohol or drugs within the last twenty-four (24) hours, the petitioner answered negatively but defendant Sturgill answered "yes" and explained. The other juvenile answered differently from the others when asked about his ability to read and write.

It was explained in great detail and in simple language what the defendants were pleading guilty to and the sentences that could be imposed and the petitioner said she understood. There is no reason to believe that she did not.

It was explained in detail and simple language that a jury trial was being waived although that was a right they could insist upon. The petitioner said she understood.

When the court asked if the defendants were pleading guilty because they were guilty, each defendant was asked by name to respond individually. The petitioner responded that she was pleading guilty because she was guilty.

The petitioner responded affirmatively that she was pleading guilty freely and voluntarily of her own free will and negatively to the question whether any force or threats of any kind had been used to cause her to plead guilty.

It was explained that if they went to a trial before a jury it was possible to be convicted of lesser offenses.

The court asked if there were any questions by any defendants as to the agreement or what was to happen afterwards. The petitioner answered negatively.

The court asked again if any defendant had any questions about anything that had been told them or asked of them. The petitioner answered negatively.

The petitioner answered the court that she was satisfied with her lawyer and had no complaint in any way about how he had represented her.

In Joseph Lance Risner, we found the trial court's error in this regard to be harmless beyond a reasonable doubt due in part to the fact that the record demonstrated the defendant as being "literate, educated, articulate, and intelligent." 2003 WL 21492929, at *9. Furthermore, we found that

[d]uring all stages of these proceedings, [Risner] was represented by competent counsel who were experienced in capital defense. [Risner's] attorneys both testified that they believed [Risner] knew the consequences of his plea when he entered it. Trial counsel discussed with [Risner] his rights and the plea dialogue. Furthermore, [Risner] signed a memorandum stating that he was aware of his constitutional rights. Therefore, we hold that his pleas of guilty were voluntarily and intelligently entered . . . .

-36-

Id.   In <u>Jason Blake Bryant</u>, we also found the error harmless.  In that case, we noted that the trial court had an "important exchange" unique to Bryant about his low-level ability to read and write, and his level of understanding about the guilty plea after his lawyer read to him the Waiver of Rights and Plea of Guilty document.  2004 WL 443414, at *12.  Based on this unique exchange, together with the fact that Bryant's lawyer was qualified to handle death penalty cases, this Court found that Bryant "understood the guilty plea."  <u>Id.</u> at *13.

The Defendant does not have Risner's intelligence or level of education.  She did not sign a special memorandum setting forth the ramifications of her plea.  She was not represented by counsel qualified to handle death penalty cases.  She was not avoiding the death penalty by pleading guilty.  She did not have a special exchange with the trial court.  Nevertheless, on the record before us, we conclude that the Defendant entered her guilty pleas voluntarily and knowingly and that the trial court's error in conducting the mass allocution was harmless beyond a reasonable doubt as to the Defendant.  The Defendant had extensive discussions with Counsel about her plea prior to entering it; she never gave him any reason to suspect that she did not understand what he was telling her; he read to her the Waiver of Rights and Plea of Guilty document verbatim; she was able to read and write without difficulty and signed this document; her testimony at both the sentencing hearing and the post-conviction hearing demonstrates that she is an articulate woman capable of understanding the basic legal issues involved; she determined to plead guilty even against the wishes of her family; and she never raised an issue about her guilty plea until after her sentencing hearing.  In short, the record demonstrates that the Defendant entered her guilty plea with the requisite degree of understanding.  Accordingly, we hold that the Defendant's guilty plea is constitutionally valid and that she is not entitled to post-conviction relief on this ground.

**CONCLUSION**
The Defendant is not entitled to post-conviction relief on the basis that she received ineffective assistance of counsel.  The trial court did not abuse its discretion in refusing to admit the Defendant's proffered expert testimony of W. Thomas Dillard at the post-conviction hearing.  The Defendant's guilty plea is constitutionally valid.  Accordingly, we affirm the judgment of the trial court denying the Defendant's claims for relief.

_____
DAVID H. WELLES, JUDGE